352 So.2d 869 (1977)
MANATEE COUNTY, Florida, a Political Subdivision, Appellant,
v.
TOWN OF LONGBOAT KEY, Florida, City of Bradenton Beach, Florida, and City of Bradenton, Florida, Municipal Corporations, Appellees.
No. 77-558.
District Court of Appeal of Florida, Second District.
November 4, 1977.
As Modified On Denial of Rehearing December 9, 1977.
*870 E.N. Fay, Jr., of Mann & Fay, Chartered, Bradenton, for appellant.
*871 I.W. Whitesell, Jr., of Wood, Whitesell & Karp, P.A., Sarasota, for appellee Town of Longboat Key.
William R. Lisch, Bradenton, for appellee City of Bradenton.
No appearance for appellee City of Bradenton Beach.
GRIMES, Acting Chief Judge.
By the adoption of our new Constitution in 1968, the people of Florida mandated that city property should not be taxed to finance services exclusively for the benefit of unincorporated areas. In Alsdorf v. Broward County, 333 So.2d 457 (Fla. 1976), our Supreme Court observed that this constitutional provision meant what it said. We now face the problems of how this provision shall be put into practice.
Article VIII, Section 1(h) of the Florida Constitution reads as follows:
"(h) Taxes  limitation. Property situate within municipalities shall not be subject to taxation for services rendered by the county exclusively for the benefit of the property or residents in unincorporated areas."
Recognizing that the implementation of this constitutional provision could cause serious problems in county fiscal planning as well as protracted conflict between city and county governments, the legislature amended Section 125.01, Florida Statutes (1973), by the enactment of Chapter 74-191, Laws of Florida, which reads in part:
"The governing body of a municipality or municipalities by resolution, or the citizens of a municipality or county by petition of ten percent of the qualified electors of such unit, may identify a service rendered specially for the benefit of the property or residents in unincorporated areas and financed from county-wide revenues and petition the board of county commissioners to develop an appropriate mechanism to finance such activity, which may either be by taxes, special assessments, or service charges levied solely upon residents or property in the unincorporated area, by the establishment of a municipal service taxing or benefit unit pursuant to paragraph (q) of subsection (1) or by remitting the identified cost of service paid by the taxes levied upon property situate within the municipality or municipalities to the municipality or municipalities."
Pursuant to the foregoing statute, the cities of Longboat Key, Bradenton, and Bradenton Beach each presented resolutions to the Board of County Commissioners of Manatee County asserting that certain categories of service provided by the county were of no benefit to the municipalities. The county's response to these resolutions neither admitted nor denied the assertions contained in the resolutions but sought to have the parties conduct further negotiations. Conceiving that they were not getting anywhere with this approach, the cities responded by filing separate actions against the county. The lawsuits were consolidated, and the case went to trial.
In an amended final judgment the court found that inequities existed "between the taxes paid by residents on property in the municipalities and the services received from Manatee County" in specifically enumerated areas.[1] The court directed Manatee County to establish municipal service taxing units or districts to correct the imbalance.[2] The court further found that for *872 the past two years, the cities of Bradenton and Bradenton Beach had received services having a value of at least as much as the taxes paid by their property owners but held the property owners of Longboat Key had paid more in ad valorem taxes in both years than they had received in services. Thus, the court directed the county to pay the Town of Longboat Key for 1975-76 the sum of $276,714.99 and for 1976-77 the sum of $227,097.10. The county has appealed this judgment, and the cities of Bradenton and Longboat Key have cross-appealed.
We believe that many of the questions raised by both sides will not have to be answered if our attention is redirected to the basic constitutional provision which is the origin of this dispute. According to Article VIII, Section 1(h), we need only to consider those services "rendered by the county exclusively for the benefit of the property or residents in unincorporated areas." The framers of our Constitution must have recognized that there are many county services which provide an indirect yet real benefit to city dwellers. There is no need to be concerned with how much more benefit from this type of service county property owners may receive when compared to city property owners because these are not services which are rendered exclusively for the benefit of the counties. The only services which must be considered are those rendered by the county which result "in no real or substantial benefits to the municipal property owners." City of St. Petersburg v. Briley, Wild & Assoc., Inc., 239 So.2d 817 (Fla. 1970).
Once these particular services have been isolated, then a vehicle must be devised whereby the cost of such services is paid only by those in the unincorporated areas. By amending Section 125.01, the legislature recognized that to accomplish this result, the county could either levy special taxes on all property in unincorporated areas or establish municipal service taxing units, or in the alternative it could simply remit to the cities the identifiable cost of such services which are paid by taxes levied upon property within the cities.
Applying these principles to the instant case, we believe that this record sustains the conclusion that all but one[3] of the services enumerated in the final judgment are being rendered exclusively for the benefit of the residents or property owners of unincorporated areas.[4] Therefore, the court was within its authority to order the county to take the steps necessary to insure that in the future the cost of such services shall be borne only by those in the unincorporated areas. However, we believe the court exceeded its authority in specifically directing the establishment of taxing districts when the statute gives to the county the option of determining which method shall be followed to accomplish this result. Section 125.01(6)(a), Florida Statutes (1975).
We further believe that a court can properly order a county to reimburse a city for taxes already paid by its property owners which went to pay for services rendered exclusively for the benefit of unincorporated *873 areas. Insofar as past years are concerned, this is the only alternative offered by the statute which would be applicable. The statute provides that any such reimbursement shall be made directly to the cities themselves, presumably upon the theory that the property owners within the cities will get the resulting benefit from decreased municipal taxes in the future. Section 125.01(6)(a), Florida Statutes (1975).[5]
However, in view of the way we have interpreted the applicable constitutional and statutory provisions, it will be necessary for the court below to make a redetermination of what the county shall be required to remit to the cities for the past two fiscal years. The previous determination was simply made by taking some figures from the county budget which compared the amount of taxes which would be paid by property owners within each city against the value of all services estimated to be provided by the county for the benefit of the property owners of those cities. In addition to the fact that these were budgets and not records of actual taxes and expenditures, they took into consideration the values assigned to many services not within the enumerated list of those being provided exclusively for the unincorporated areas. Thus, the bottom line figures reflected deductions in those instances where certain services rendered to the cities were thought to be of more value than the taxes applicable to those services. In addition, this method of computation had the effect of disregarding the fact that the county receives large sums of money each year from sources other than ad valorem taxes, such as state and federal revenue sharing funds. The net effect was that a city (as in the case of Bradenton and Bradenton Beach) whose property owners paid more taxes than the value of services provided for them by the county was deemed not to be entitled to receive any payment from the county. This would permit the county to allocate all monies which were not raised by ad valorem taxes to pay for services rendered exclusively for the benefit of unincorporated areas and thereby thwart the spirit of Article VIII, Section 1(h).
Neither the Constitution nor the statute specifies the manner by which the cost of services rendered exclusively for the benefit of unincorporated areas shall be allocated. Therefore, it becomes necessary for the court to fashion a suitable method for the resolution of this controversy. See Alsdorf v. Broward County, supra. We think that the formula most consistent with the constitutional mandate requires that the cost of these services be allocated in the proportion that the ad valorem taxes paid by the municipalities bears to the total amount of county ad valorem taxes. In a case such as this where not all of the municipalities of the county are joined in the suit, the reimbursements need only be made to those municipalities involved in the suit based upon the percentage of total county ad valorem taxes paid by each city.[6]
As Judge Ott suggests, if most of the countywide revenue comes from sources other than ad valorem taxes, this could mean that the municipalities would receive a rebate of a greater sum than the amount of ad valorem taxes their citizens paid. However, to adopt Judge Ott's formula would have the practical effect of allowing the counties to render services exclusively for the benefit of unincorporated areas on a large scale and make substantially smaller reimbursements to the cities.[7] This is because *874 the total budget figure into which he divides the cost of exclusive services necessarily includes not only ad valorem taxes but all other monies received by the county. We believe that Judge Ott's formula overlooks the fact that state and federal revenue sharing funds were created by taxes in the first place which were paid in part by those living within the municipalities.[8] The state and federal formulas by which these funds are allocated to the various counties are complex, but it cannot be denied that the amount of such funds received by any given county would be substantially less if the population of the municipalities within that county and the taxes paid by those within those municipalities were ignored in the computation. By applying the formula we have adopted, the counties will be required to reimburse the cities for the full amount of what it costs the counties to render the services for which the cities received "no real or substantial benefit."[9]
In making these redeterminations, we caution the court that it will be necessary to take into consideration the substance of the resolutions submitted by each of the cities to the county prior to the filing of their lawsuits. Each of the services ultimately held by the court to be those which were rendered exclusively for the benefit of unincorporated areas of the county were included or referred to in one or more of the resolutions. This was sufficient to permit the court to direct municipal service taxing units to be created in order to pay for each of these services in the future. However, not every resolution referred to each such service, and the City of Bradenton Beach did not pass a resolution with reference to the 1975-76 fiscal year. These resolutions were mandated by Section 125.01(6)(a), which was obviously designed to force the representatives of the cities and the counties to get together prior to litigation in order to seek to resolve their disagreements. This is a proper legislative implementation of the constitutional mandate which persuades us to conclude that if a city fails to bring its complaint concerning a particular service to the attention of the county through an appropriate resolution, it may not later claim a rebate on the basis that such a service was of no real or substantial benefit to its taxpayers. In view of the statutory scheme, it would be unfair to allow a city to be reimbursed for a past year's service which has now been determined to have been rendered exclusively for the unincorporated areas when the city had never brought to the county's attention that the service might be of such a nature.
When the amount of the rebate to which each city is entitled has been finally determined, the court should enter a judgment which will have the effect of not requiring the payments to be made until the county has had at least one year within which to assess and collect the necessary extra taxes. The monies to pay these rebates must be paid by the property owners outside the municipalities since it was the unincorporated areas which received the exclusive benefit of the services in the first place. Section 125.01(6)(a) provides authority for these areas to be specially taxed to pay for services rendered for their exclusive benefit, irrespective of the creation of municipal service taxing units.
The conclusions we have reached in this opinion will not insure that each taxpayer will receive a dollar's worth of services for every dollar in taxes which he pays. However, we believe that the procedure we have outlined will simplify a problem which might otherwise defy solution. While perhaps not eliminated, the inequalities of dual taxation should be substantially diminished.
AFFIRMED in part; REVERSED in part; and REMANDED for further proceedings consistent with this opinion, at which all previous evidence may be considered *875 together with such further evidence as may be properly submitted.
RYDER, J., concurs.
OTT, J., concurs specially with opinion.
OTT, Judge, concurring specially.
The majority, as did the lower court before us, wrestled with a series of practical difficulties that arise from rather vague (perhaps advisedly so) legislation complicated by the increasing input of revenues other than ad valorem taxes (race track funds, cigarette taxes, federal and state revenue sharing funds, etc.) to the cost of county government.
My principal concern with the majority opinion is the formula for calculating the remittitur due the city (or cities) for "the identified cost of service" (meaning "services ... exclusively for the benefit of the ... unincorporated areas").
The formula directed by the majority opinion conceivably could produce a remittitur to the city that exceeds the total revenues derived from county ad valorem taxes on property in the city. It would at least result in the city receiving a remittitur from "exclusive" services funded largely or totally by other revenues. But therein lies the problem  and the reason for the majority formula. Left to its own devices the county would obviously throw all  or as much as possible  of this outside revenue into the cost of exclusive services and provide no benefit (or tax relief) to the city taxpayer by reason of their receipt.
While not perfect by any means I would consider it a more equitable approach to calculate the remittitur on the basis of the percentage of the total county budget going into the exclusive services. That percentage of the city's portion of the county ad valorem taxes would constitute the remittitur. This approach would have the effect of spreading all county revenue, however derived, to all county services, however funded. Such an approach becomes extremely significant in the case of a small petitioning city in a county where there are one or more far larger cities  the actual dollar contribution of the small petitioning city being relatively insignificant.[1]
NOTES
[1] "(1) Law Enforcement (only as to road patrol, investigations, and communications on a basis of 90 percent unincorporated areas and 10 percent countywide);

"(2) Road and Bridge Funds (including engineering, highway department, right-of-way acquisition, and drainage);
"(3) Planning and Development;
"(4) County Bus System;
"(5) Fire Control;
"(6) Lot Clearing;
"(7) Land Fill and Mosquito Control financed by countywide revenues as levied and controlled by Manatee County (except for countywide revenues levied by Manatee County for the Manatee County Mosquito Control Board)."
[2] The court directed that the following districts be established:

"(1) A district comprising the municipalities or separate districts for one or more of the municipalities within the County;
"(2) A municipal service taxing district or districts shall be established for the urban areas of the unincorporated portions of the County; and
"(3) A municipal service taxing district or districts shall be established for the rural areas of the unincorporated portions of the County."
[3] With respect to the enumerated segments of law enforcement, the court seems to be saying that the city property owners are getting their money's worth with respect to 10% of the expenditures for these purposes. As we interpret the Constitution, a particular service is either provided "exclusively for the benefit of the property or residents in unincorporated areas" or it is of "real and substantial benefit" to the property owners or residents of the cities even though the benefits accruing to the unincorporated areas may be of a more tangible nature. Faced with the requirement of making this kind of determination, we cannot say where the court would have placed these categories of law enforcement and we, therefore, remand that aspect of the case for further consideration according to the principles set forth in this opinion.
[4] We hasten to add that this conclusion pertains only to Manatee County. Whether a particular service would fall within that category if rendered in another county would depend upon the facts peculiar to that county.
[5] The recognition by § 125.01(6)(a), Fla. Stat. (1975), that the governing bodies of the cities represent their taxpayers in disputes over dual taxation also provides sufficient authority for us to reject the county's contention that the suits should have been dismissed for failure to join a taxpayer within each city as an indispensable party.
[6] For example, suppose the cost of county fire control for a given year was $100,000, the taxpayers of Bradenton paid ad valorem taxes of $900,000, and the total county ad valorem taxes were $6,000,000. In this event, the county would be required to pay the City of Bradenton the sum of $15,000 (15% of $100,000).
[7] Applying Judge Ott's formula to the example in footnote 6 and assuming the total county budget to be $10,000,000, the county's reimbursement to the City of Bradenton for fire control would only be $9,000.
[8] The same would be true of most of the other outside sources of revenue such as license fees.
[9] Our formula is also consistent with the statutory options which permit the county to create municipal service taxing units or to levy special assessments upon the unincorporated areas in order to pay the entire cost of the services rendered exclusively for the benefit of property or residents in those areas.
[1] A graphic illustration may be made if we assume a simple (but not unrealistic) hypothetical as follows:

 1. Total cost of all county services
 (total budget) $20,000,000.00
 2. Cost of the exclusive services
 (as to petitioning city) 10,000,000.00
 3. Total county ad valorem taxes 5,000,000.00
 4. Petitioning city's ad valorem
 contribution 1,000,000.00

Under the formula of the majority opinion the petitioning city would be remitted the total sum of $2,000,000.00 or twice the total ad valorem taxes it had contributed. Under the formula I suggest the petitioning city would be remitted the total sum of $500,000.00  it could never receive a remittitur exceeding its actual ad valorem contribution.